# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

ADELA M. RODRIGUEZ,                          CASE NO. 1:09-cv-01800-SMS

              Plaintiff,

    v.                                           ORDER

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.

_____/

Plaintiff Adela M. Rodriguez, by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act and for  supplemental security income  ("SSI"), pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act").  Plaintiff's appeal addresses solely psychiatric limitations, not the physical limitations that also were part of her application for benefits.  The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1]  Following a review of the complete record, this Court concludes that the ALJ's determination was not supported by substantial evidence.  Accordingly, the Court reverses and remands for payment of benefits.

---

[1]  Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 8 & 9).

## I.   Administrative Record

### A.   Procedural History

On November 21, 2006, Plaintiff applied for disability benefits pursuant to Title II of the Social Security Act and for supplemental security income ("SSI"), alleging disability beginning July 15, 2003. Her claims were initially denied on April 12, 2007, and upon reconsideration, on August 9, 2007. On September 10, 2007, Plaintiff filed a timely request for a hearing. Plaintiff appeared and testified at a hearing on November 18, 2008. May 18, 2009, Administrative Law Judge Michael J. Kopicki denied Plaintiff's application. The Appeals Council denied review on August 22, 2009. On October 8, 2009, Plaintiff filed a complaint seeking this Court's review.

### B.   Factual Record

Plaintiff (born May 12, 1959) was formerly an assistant administrator of a group home for disturbed adolescent boys. As assistant administrator, Plaintiff prepared paperwork; hired, fired, and supervised the staff of 22 people on weekends; and administered medication. Plaintiff was on her feet, standing or walking, about twelve hours a day. She was also required to lift and carry the residents when restraint was necessary. She lifted 100 pounds occasionally and 50 pounds frequently, carrying the boys from five to twenty-five feet on a daily basis. Prior to her administrative position, she was a group home counselor and a school social worker.

Plaintiff completed her bachelor's degree at Fresno State University. She also completed one year of studies in the master's program but suspended her studies following her first cancer diagnosis and did not complete her dissertation.

Plaintiff was attacked on the job on June 1, 2003--stabbed by a resident using a shard of glass. (One source described the glass as having been thrust deep into the tendon.) Threatening to kill her, the resident seriously cut Plaintiff's right knee (when she tried to kick the glass away), then attempted to cut her throat. After other staff subdued him, the resident said that he wanted to kill Plaintiff and had laughed at her during the attack. Plaintiff recalled his laughter and an "intense psychotic expression."

Plaintiff was treated in the emergency room, where she required thirteen stitches to close the leg wound. Two days later, she developed an infection, requiring further treatment. Within a

few days, she began to experience frequent overwhelming flashbacks, nightmares, and intrusive thoughts that left her weeping.  The psychological symptoms were accompanied by chest pain, shortness of breath, trembling, and dissociation.  As time passed, the scar on Plaintiff's knee became a trigger for flashbacks, intrusive thoughts, and panic attacks.

When Plaintiff returned to work within a few days of the attack, Plaintiff's supervisor demoted her (although her salary remained the same), claiming that she was reorganizing the organization.  Later in June, Plaintiff was placed on temporary disability (workers' compensation) because of her psychiatric problems.  In August, Plaintiff was reclassified as a child care worker, ostensibly to eliminate the stress of supervising staff and residents.  Plaintiff interpreted these actions as retaliation for having been injured.

She was "scared all the time" that someone was after her and hid in her apartment with the blinds closed.  Psychiatrist John D. Harbison, M.D., who evaluated Plaintiff in October 2004 in conjunction with her workers' compensation claim, reported that Plaintiff became hypervigilant and easily startled.  She manifested avoidant behavior, including not driving anywhere near the group home.  More gradually she became depressed, crying for no reason, with decreased energy, decreased motivation, impaired concentration, feelings of hopelessness and helplessness, and loss of interest in activities that she previously enjoyed.  She experienced insomnia, decreased libido, and loss of appetite (losing 38 pounds).  She had frequent suicidal ideation.

Plaintiff requested counseling, but received no response for several weeks.  Because of delays attributed to worker's compensation regulations, Plaintiff did not receive psychiatric care until September 2003 when she began treatment with psychiatrist Richard E. Land, D.O.  Land prescribed Serzone[2] and Zonegran,[3] which began to decrease Plaintiff's insomnia and depressive symptoms.

///

---

[2] Serzone (nefazodone) is prescribed to treat depression. www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0000956 (March 28, 2011).

[3] Zonegran (zonisamide) is used in conjunction with other medications to treat seizures.  . www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000217 (March 28, 2011).  In Plaintiff's case, it was prescribed to relieve insomnia.

On February 5, 2004, Land prepared a letter to the State Compensation Insurance Fund, outlining Plaintiff's psychiatric history. Plaintiff's family of origin was troubled and abusive. Several close family members have histories of mental illness or suicide. Although Plaintiff was well-oriented and not delusional, she demonstrated memory problems. Plaintiff reported sleeping problems, flashbacks, and nightmares. She was increasingly irritable and depressed. She perceived that people around her laughed at her and talked about her. Her score on the Zung Self-Rating Depression Scale (SDS) was 68, severely depressed.

Land diagnosed Plaintiff:[4]

| | |
|---|---|
| Axis I (Clinical Syndrome) | Major depressive disorder, single episode (296.22) |
| | Generalized Anxiety Disorder (300.04) |
| Axis II: | Personality Disorder: Paranoid |
| Axis III: | Physical Disorder and Condition: Deferred to Appropriate Specialist |
| Axis IV: | Psychosocial Stressor is 4–Severe |
| Axis V: | Global Assessment = 55 |

AR 233.

In April 2004, Plaintiff threatened suicide, getting as far as putting a rope around her neck and standing on a chair before calling a suicide hotline.

In June 2004, Plaintiff suffered a recurrence of breast cancer in her right breast, with metastases to multiple lymph nodes. She previously had breast cancer in 1993 in her left breast.

According to psychiatrist Ana Mendoza, M.D., who treated Plaintiff at Fresno County Mental Health, the second cancer diagnosis provoked another suicide attempt. It exacerbated her

---

[4] The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR"). It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." Id. at 34. The first description in the range indicates symptom severity; the second, level of functioning. Id. at 32. In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings. Id. at 33.

GAF 55 is at the midpoint of the range GAF 51-60, which indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attack) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id. at 34.

1   depression and PTSD, and triggered flashbacks of physical and sexual abuse in her childhood.

2   Mendoza noted Plaintiff's history of repeated suicide attempts.  Overwhelmed, Plaintiff attempted

3   to slash her wrists.

4           Plaintiff was required to discontinue certain medications for depression and anxiety during

5   her radiation and chemotherapy treatment.  Because Plaintiff's psychological problems would

6   have been "permanent and stationary"[5] had she not suffered a recurrence of breast cancer, on July

7   27, 2004, the State Compensation Insurance Fund withdrew financing for Plaintiff's psychological

8   care, including her prescriptions for Effexor XR and Serzone.  Land protested that, in light of the

9   advanced stage of Plaintiff's cancer, it was "not a good time for [Plaintiff] to be bogged down in

10  bureaucratic nonsense."  AR 237.  He suggested that, as a MediCal provider, Plaintiff's oncologist

11  might be able to prescribe her medications.  In a subsequent note, he explained that Plaintiff was

12  experiencing post-surgical pain and serious emotional problems that constituted a psychiatric

13  crisis.

14          Ultimately, Land arranged for Plaintiff's care to be transferred to Fresno County Mental

15  Health ("FCMH").  In his final report, Land opined, "This woman will require ongoing psychiatric

16  care because of her current medical condition.  She is facing a very grim future without proper

17  psychiatric support and medication."  Land added, "When I read the monthly reports written by

18  her treating physician, Mr. Andre, they do not sound like the patient I know.  He reports that she is

19  responding well to medication and is improving.  However, I have seen a patient who is extremely

20  depressed and considering suicide."  AR 243.

21          FCMH provided individual counseling with a psychiatric social worker every other week

22  and adult group therapy.

23          On September 29, 2004, Ana Mendoza, M.D., who treated Plaintiff at FCMH, diagnosed:

24  Axis I          Major depressive disorder, superimposed on dysthymia
                    PTSD chronic recurrent

25                  Rule out mood disorder due to General Med. Cond.: Chemotherapy

26

27          [5] "A disability is considered 'permanent and stationary' for workers compensation purposes 'after the
    employee has reached maximum medical improvement or his or her condition has been stationary for a reasonable

28  period of time." *Gangwish v. Workers' Compensation Appeals Bd.*, 89 Cal.App.4th 1284, 1289 n. 7 (2001), *quoting*
    8 Cal. Code Regs. § 10152.

Axis II:        Deferred

Axis III:       Diagnosis of left breast cancer; current treatment for right breast cancer; history of knee surgery

Axis IV:        Current illness, economic, social support, termination of PCP access due to termination of workers' comp

Axis V:         Global Assessment = 50

AR 317.[6]

When Harbison prepared the report to workers' compensation in October 2004, Plaintiff was receiving permanent disability payments from workers' compensation while she underwent chemotherapy. Her depression was eight or nine on a scale of ten; about three times per week she continued to experience nightmares, flashbacks, and intrusive thoughts with associated "full blown panic attacks." Although less severe than immediately after the stabbing, Plaintiff continued to experience avoidant behavior, isolative behavior, and hypervigilance with an exaggerated startle response. She had continued suicidal ideation. Although she was still anxious and uncomfortable in crowds, she was now able to attend church services.

Harbison noted that Plaintiff reported a history of childhood abuse. She described lifelong low grade depression (dysthymia) and occasional thoughts of suicide. She had attempted to stab herself at age ten. Other family members were also diagnosed, or exhibited symptoms of, mental illness. A brother committed suicide by hanging in 1998. Plaintiff's twin was diagnosed with bipolar disorder.

Harbison administered the Minnesota Multiphasic Personality Inventory (MMPI-2), which indicated that Plaintiff was either extremely disturbed or exaggerating her symptoms to secure attention or services. Harbison suggested further investigation to resolve the issue.

According to Harbison, if Plaintiff's MMPI score was accurate, she would be chronically psychologically maladjusted, overwhelmed with anxiety, tension, and depression. She would feel

---

[6] GAF 50 is at the uppermost point of the range GAF 41-50, which indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, inability to keep a job). DSM IV TR at 34.

The reference to knee surgery refers to arthroscopic surgery on Plaintiff's left knee, not the stabbing of her right knee.

helpless, alone, inadequate and insecure, and believe that life was hopeless.  Her life would be disorganized and unhappy, and she would have difficulty concentrating and making decisions. She would have problematic personal relationships, lack basic social skills, and be withdrawn, without fully trusting or loving anyone.  Such a person would have a severe psychological disorder, such as anxiety disorder or dysthymic disorder with a schizoid personality. Schizophrenia or other severe mental illness would be a possible diagnosis.

Harbison also administered the Millon Clinical Multiaxial Inventory III (MCMI-III). Harbison summarized:

> The MCMI-III profile suggests Axis I diagnoses of major depression recurrent severe without psychotic features, Posttraumatic Stress Disorder, and Adjustment Disorder with anxiety.  The profile suggest personality configuration composed of Depressive Personality Disorder and Self-Defeating Personality Disorder with schizoid and avoidant personality traits.

AR 433.

Finally, the Symptom Checklist-90-R (SCL-90-R) revealed symptoms in the clinical range.  Plaintiff demonstrated an extremely high intensity of distress, consistent with multiple clinical diagnoses.

Harbison diagnosed:

| Axis I | Posttraumatic Stress Disorder chronic (309.81) |
| | Major Depressive Disorder single episode moderate (296.22) |
| | History of Dysthymic Disorder pre-existing non-industrial |

| Axis II: | Probable schizoid and avoidant traits |

| Axis III: | Status post knee laceration in assault on 6/1/03 |
| | History of cancer of the left breast status post lumpectomy, chemotherapy and radiation therapy in 1993 |
| | Right breast cancer stage 3A status post lumpectomy and lymph node resection on chemotherapy with radiation planned |
| | History of left knee arthritis status post arthroscopic surgery |

| Axis IV: | Level of Psychosocial Stress–Severe.  History of childhood trauma, traumatic assault at work on 6/1/03, breast cancer. |

///

///

///

///

1    Axis V:        Global Assessment of Functioning - 60

2    AR 433-34.[7]

3       Harbison opined that Plaintiff could not be considered permanent and stationary from a

4    psychiatric viewpoint and suggested that, for workers' compensation purposes, she be considered

5    temporarily totally disabled.  Because Plaintiff's psychiatric condition was not then permanent

6    and stationary, Harbison could not render an opinion on Plaintiff's permanent condition.

7       **Suicide Attempt (June 2005).**  In June 2005 Plaintiff was hospitalized for two days with

8    depressive symptoms following a suicidal plan to jump in the canal.  She was distraught over

9    financial problems.

10      **Tonsillectomy.**  In June 2006, Plaintiff experienced a tonsillectomy to address chronic

11   sore throat.

12      **Plaintiff's Adult Function Report.**  In an adult function report prepared January 19,

13   2007, Plaintiff reported that she lived alone, and cared for herself and her cat.  She cooked for

14   herself and reported no problems with personal care.  She kept her own house.  She went outside

15   daily and did her own shopping.  Plaintiff managed her own financial affairs, used money orders,

16   but had no savings account.

17      She was no longer able to maintain employment, lacked concentration, had memory loss,

18   and could not get along with others.  Because she experienced insomnia and nightmares, she took

19   medication to sleep.

20      Following her injuries, Plaintiff limited her social activities, especially large gatherings.

21   She shared meals with her adult daughter, and attended group therapy and doctors' appointments.

22   Because of her "extreme stress," relations with the rest of her family were poor, marked by

23   arguments and little contact.  She was argumentative and irritable.  Continually stressed and

24   anxious, Plaintiff was depressed and experienced panic attacks.  She had developed fear of the

25   dark, fear of large groups of people, and fear of being physically assaulted.

26

27          [7]     GAF 60 is at the top of the range GAF 51-60, which indicates "Moderate symptoms (e.g., flat
28   affect and circumstantial speech, occasional panic attack) OR moderate difficulty in social, occupational, or school
     functioning (e.g., few friends, conflicts with peers or co-workers).  DSM IV-TR at 34.

**Third-Party Adult Function Report.** In a third-party adult function report, Plaintiff's daughter, Christina Salinas, reported that Plaintiff was no longer able to work and had a phobia of large groups of people. She was sometime unable to sleep at night and had nightmares. Plaintiff was able to perform personal care, cook, and clean her own home. She shopped, was able to manage her own finances, but was limited by lack of income. She was easily bored and had trouble concentrating. Her condition affected her memory, concentration, ability to complete tasks, and ability to get along with others. Plaintiff was argumentative, irritable, anxious, and did not listen to others. She could not handle stress.

Plaintiff's medications included Ambien CR,[8] Lamictal,[9] Effexor XR,[10] Lithium,[11] Tramadol,[12] and aspirin.[13]

**Agency interview.** Following a telephone interview with Plaintiff in December 2006, agency interviewer A. Ohanian noted, "[Plaintiff] had a hard time remembering information and she had a hard time concentrating during the interview. [Plaintiff] sounded depressed during the interview."

**Agency Psychiatric Review.** On March 29, 2007, psychologist Charles Lawrence, Ph.D., performed the agency's psychiatric review technique for the time period from February 7, 2006 to March 29, 2007. Lawrence opined that Plaintiff had affective disorders and personality disorders

---

[8] Ambien (zolpidem) is a sedative-hypnotic drug that treats insomnia by slowing brain activity. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000928 (March 28, 2011).

[9] Lamictal (lamotigine) is prescribed to increase the time between episodes of depression, mania, and other persons with bipolar disorder. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000957 (March 28, 2011).

[10] Effexor XR (venlafaxine) is a selective serotonin and norepinephrine re-uptake inhibitor (SNRI) used to treat depression, generalized anxiety disorder, social anxiety disorder, and panic disorder. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000947 (March 28, 2011).

[11] Lithium is an antimanic agent used to prevent episodes of mania in persons with bipolar disorder. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000531 (March 28, 2011).

[12] Tramadol is used to relieve moderate to moderately severe pain by persons expected to experience 24-hour pain on a long-term basis. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960 (March 28, 2011). Plaintiff's doctor prescribed Tramadol to treat pain attributable to spinal degeneration.

[13] Among other reasons, aspirin is used to prevent a recurrence of a mini-stroke or transient ischemic attack ("TIA") in persons who have previously experienced a mini-stroke or TIA. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000802 (March 28, 2011).

that were not severe.  She had medically determinable impairments of major depression and borderline features.  Lawrence opined that Plaintiff had no restrictions of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence and pace, and no episodes of decompensation of extended duration.  Lawrence noted:

> The claimant has been in mental health treatment for several years, continuing through the recent past.  She receives treatment at Fresno Metro Services. Psychotropic medication is managed by a nurse practitioner, and counseling services are provided by a psychologist and a social worker.  The claimant had ceased participation in treatment for a number of months in 2005, returning in Dec. 2005.  Soon thereafter, in Feb 2006, there was a crisis and the claimant was sent to the hospital on a 5150, but there is no record of admission at that time.  The progress notes by the treating sources since then show favorable response to treatment, with occasional exacerbation of emotional distress associated with family issues, medical issues, and financial issues.  The nurse practitioner notes show consistent [within normal limits] mental status ratings from Sept to Dec 2006.  In Aug she enjoyed a trip to Disneyland with her niece. In Sep she told the LCSW she was "feeling great."  In Oct 06 she was feeling good in spite of some health concerns.

> In her function report the claimant alleges she becomes depressed and anxious when under extreme stress, and that tends to be consistent with the progress notes. But her ADL functioning is generally of good range and full independence,

> AR 383.

Lawrence concluded that Plaintiff's mental impairment was not severe.

**Group Therapy.**  On March 20, 2007, social worker M. Heffron noted that Plaintiff had not required emergency services for suicidal intent in several months. On April 17, 2007, Heffron noted Plaintiff's "passive suicidal intent" in the face of stress related to losing her apartment and having to move in with her daughter, and to her son's imminent departure for boot camp.

In June 2007, Plaintiff reported continuing chaos with her daughter and son-in-law, on whom she was reluctantly financially dependent.  Her son-in-law was alcoholic, abusive, unpredictable, and threatening.  Plaintiff felt great sorrow to see her daughter submitting to marital abuse just as Plaintiff had done.  She expressed helplessness, while the group encouraged her to take precautions and make a safety plan.  She was deeply hurt that her son, who had been medically discharged from the armed forces, had not contacted her since his return to the Valley.

In early July 2007, Plaintiff underwent ultrasound treatment to break up kidney stones with good results.  Heffron observed that Plaintiff seemed to be coping better with her extended family,

learning to stand up for herself without losing her temper.  Nonetheless, Plaintiff was anxious about her daughter, who had separated from her alcoholic and abusive husband, but relieved that the husband was out of the house.  Plaintiff reported that support from the group was helping to reduce her thoughts of suicide.

In early August 2007, Plaintiff experienced a mild stroke.  Heffron noted that Plaintiff was displaying memory problems during group therapy on August 28, 2007.

Throughout the course of group therapy in 2007, Plaintiff continued to work toward reducing feelings of depression and crying spells.  She continued to experience flashbacks and nightmares of childhood trauma.

**December 2007.**  At her December 14, 2007 appointment with Bogost, Plaintiff was crying, complaining of feeling anxious and irritable.  She felt no pleasure and was hopeless and apathetic.  Bogost characterized her as suicidal.  Her memory was impaired.

**January 2008.**  In notes from an appointment on January 4, 2008, Bogost noted that Plaintiff stated that she was feeling much better.  But she was not compliant with medication, having forgotten to pick up her prescriptions.  She was disheveled and suspicious, demonstrating motor retardation and impaired memory.  Her intelligence seemed below average: her thoughts were disorganized and she was slow to respond to questions.  She was suicidal.

**Suicidal Ideation (2007).**  Plaintiff twice went to the PAC unit in 2007: once when she attempted to hang herself and once when she wanted to jump into the canal.  Following one of those incidents, she was hospitalized for four days.

**Suicide Attempt (March 2008).**  On March 4, 2008, Plaintiff was admitted to Kaweah Delta Medical Center after attempting suicide by overdosing on Ambien and Lamictal.  She remained in the hospital for two days before being discharged to her daughter, who agreed to secure Plaintiff's medication.  The precipitating events for this attempted suicide were her son's denying Plaintiff a planned visitation with her grandchildren when she arrived at his home and the return of a childhood abuser from out of state to family in the area.  Hospital records noted old bruises on her shins and arms.

*///*

In a Plan of Care document prepared for Plaintiff on March 11, 2008, by Mary Sanchez of FCMH, Plaintiff was described as significantly impaired and probably developmental disabled. Plaintiff told Sanchez that she was depressed all of the time and that, about three times a week, she was anxious and fearful that some one was after her.  Plaintiff had experienced a stroke the previous year and was living with her daughter and son-in-law for lack of funds.  She was anxious and fearful.

In a follow-up appointment with Dr. Bruce Bogost at FCMH on March 25, 2008, Plaintiff reported that it was stressful at home, where she lived with her daughter and son-in-law. Plaintiff told Bogost, "My son-in-law wants me out."

**Plaintiff's testimony.**  Questioned by the ALJ at the November 2008 hearing, Plaintiff testified that she was living with her daughter and receiving General Relief.  She described her limitations as both mental and physical.  First, she explained that, as a result of the 2003 attack, she had been diagnosed with post-traumatic stress disorder, which gave her panic attacks (about twice a week) and major depression.  She isolated herself and felt suicidal.  When she experienced a panic attack, usually in a large group of people and often in stores, she became dizzy and short of breath.  She addressed the attack by leaving the scene.  Although the attacks usually occurred in a crowd, a few people could trigger an attack if one looked like the resident who assaulted her.

Plaintiff apparently struggled while testifying about her depression, causing the ALJ to direct her to take her time and sip water if needed.  Plaintiff simply stated, " I said I'm isolated.  I feel sad all the time.  I don't want to go out and around people."  The ALJ then redirected Plaintiff's focus, asking about Plaintiff's relationship with her daughter.  Plaintiff responded that she and her daughter got along very well and that her daughter monitored Plaintiff's medication and helped her to function.

In a typical day, Plaintiff awoke around 10 a.m.  She prepared simple meals such as cereal or sandwiches.  She vacuumed and watched about three hours of television.  She preferred violent shows even though they provoked unpleasant memories.  She listened to oldies music.  She cared for the plants on her patio.  Although she was friends with her sister-in-law, she avoided the rest of her family members, who were frequently fighting with each other.  Plaintiff did not belong to

any organizations or attend church.  Although Plaintiff enjoyed reading, she struggled with the vocabulary and often had to re-read portions.

Because of county budget cuts, Plaintiff no longer received group therapy but only saw a psychiatrist, who monitored her medication bimonthly.  When she was feeling suicidal, she saw the psychiatrist monthly.  Plaintiff's medications included Ambien, Effexor, and Lamictal.  Since her March 2008 suicide attempt, she also took lithium, which helped her control suicidal thoughts.  The medications produced dizziness and confusion.  Plaintiff feared that, without the medication, she would kill herself.

Plaintiff had not driven since the March 2008 suicide attempt.  Her car was then impounded, and she lacked the money needed to reclaim it.  Since then, she used the bus to travel to doctor's appointments, to go shopping, and to go to the hearing.  Plaintiff coped with the bus by standing and keeping her distance from people.  If a bus was too crowded, she waited for the next one.

Plaintiff agreed with the ALJ that her old job in the group home would be too difficult.  When the ALJ suggested that she work as a counselor, Plaintiff demurred, explaining that counselors were always around people for counseling.  Plaintiff though she could work part-time, at most, if the position involved working alone.  She did not think she could work full time since she could not concentrate and was easily distracted.

Plaintiff was then questioned extensively by her attorney.  She testified that she could concentrate no more than fifteen minutes at a time before requiring an approximately two-hour break.  She had suicidal thoughts daily but distracted herself with activity, such as playing with her cat or watering her plants.  Isolating herself, perhaps looking at her plants, also helped.  When the feelings were severe, she would usually volunteer to be hospitalized.  Since March 2008, however, she resisted requesting hospitalization because her acknowledging suicidal thoughts frightened and worried her daughter.  Since the attack, she sometimes worried about people trying to hurt her.  When frightened, she would close the blinds and peep out.

**Vocational expert testimony.**  Thomas C. Dachelet testified as the vocational expert.  He characterized Plaintiff's prior work as housekeeper (light, 60) and counselor (medium, SVP3).

1  Dachelet noted that the exertional level of Plaintiff's prior work varied greatly, "depending on the
2  altercation."

3      For the first hypothetical question, the ALJ directed Dachelet to assume an individual aged
4  44 to 49 with a bachelor's degree and Plaintiff's work history.  As a result of depression, anxiety,
5  and post traumatic stress syndrome, the individual is limited to simple unskilled routine work.
6  She may have no contact with the general public as a part of her job duties and no more than
7  incidental contact with co-workers.  Dachelet responded that such a person could not perform
8  Plaintiff's prior work.  Such a person could perform other work in the full range of sedentary
9  through very heavy but with no "physical impact."  An available job would be packager (DOT No.
10  920.587-134; 16,071 jobs in California).

11      For the second hypothetical question, the ALJ directed Dachelet to consider the individual
12  described in hypothetical question 1, who in addition, was able to lift/carry twenty pounds
13  occasionally and ten pounds frequently and could only occasionally climb stairs.  Dachelet opined
14  that such a person could work as a garment sorter (DOT No. 222.687-014; 33,708 positions in
15  California); flat work tier [sic] (a laundry job) (DOT No. 361.587-010; 17,953 positions in
16  California); or a miscellaneous agricultural worker–field inspector (DOT No. 408.687-010;
17  27,456 positions in California).

18      For the third hypothetical, the ALJ directed Dachelet to consider an individual aged 44 to
19  49, with a bachelor's degree and Plaintiff's work history, who can lift/carry twenty pounds with
20  the right arm and ten pounds with the left arm; should only occasionally climb; is limited to
21  simple, routine tasks and can focus and concentrate on a task in only fifteen-minute increments
22  before requiring removal from the work environment for thirty minutes.  Dachelet opined that
23  such person was not employable.

24      Plaintiff's attorney then requested Dachelet to assume the facts of the first hypothetical
25  plus assume that the person would not consistently report to work and would miss one to two days
26  per month.  Dachelet opined that such a person would be unemployable.

27  ///
28  ///

14

## II.    Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2003.  She had multiple severe impairments: anxiety, personality disorder, degenerative disc disease of the thoracic spine, history of breast cancer, and obesity..  Her impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  She was unable to perform her past work.  Plaintiff had the residual functional ability to lift and carry 20 pounds occasionally and 10 pounds frequently, to stand/walk six hours in an eight-hour

work day; to sit six hours in an eight-hour workday; and to climb stairs occasionally. When performing job duties, Plaintiff can only perform work with no public contact and with only incidental contact with co-workers.  The ALJ concluded that Plaintiff was not disabled.

**III.    Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

The scope of review requires this Court to consider the record as a whole, examining both the evidence supporting the ALJ's decision and the evidence that does not.  When it did so, the Court discovered a record more extensive than the documents on which the ALJ had relied, which portrayed the claimant very differently than the ALJ did.  When considered in light of applicable law, the Court concludes that the ALJ erred in denying Plaintiff benefits.

**IV.    Discussion**

**A.       Plaintiff's Lack of Credibility**

Plaintiff contends that the ALJ erred in finding her testimony not fully credible without providing clear and convincing reasons for his findings.  The Commissioner responds that the ALJ appropriately rejected Plaintiff's testimony as internally inconsistent, inconsistent with

1  conduct, and unsupported by the record.  A careful review of the record as a whole revealed that,

2  with regard to the psychiatric limitations that are the subject of this appeal, medical records were

3  consistent with Plaintiff's testimony and inconsistent with the ALJ's findings.

4       Declaring that his determination must be based on the entire record, the ALJ first

5  summarized Plaintiff's testimony:

6       The claimant testified that she lives with her adult daughter.  She said she is 5 feet,
   1 inch tall and weighs 215 pounds.  She said she had been attacked in the group

7  home where she worked and as a result, feels suicidal and has panic attacks.  She
   takes care of her personal needs, cares for her cat and plants, watches TV, prepares

8  simple meals, and reads books and magazines.  She said she goes shopping once a
   week, but talks to no one and does no socializing.  She uses public transportation

9  but not a computer.  Allegedly she can concentrate for only 15 minutes before
   becoming distracted.  She said that since she had bilateral breast cancer and

10  radiation, she has not been able to lift more than 10 pounds.  She said a transient
   ischemia attack she had in August 2007 caused facial drop on the right side and has

11  left her without any energy.

12  AR 14.

13       The ALJ then analyzed the third-party report prepared by Plaintiff's daughter, finding it

14  consistent with Plaintiff's own account to Dr. R. Damania in December 2008.  (The ALJ sent

15  Plaintiff to Damania following the hearing primarily for a consultative assessment of her physical

16  impairments.)  The ALJ then declared:

17       After careful consideration of the record, I find the claimant's medically
   determinable impairments could reasonably be expected to cause the alleged

18  symptoms; however, the claimant's statements concerning the intensity,
   persistence and limiting effects of these symptoms are not credible to the extent

19  they are inconsistent with the above residual functional capacity assessment.

20  AR 14.

21       Omitting Plaintiff's physical limitations from this appeal results in some complications of

22  analysis.  The ALJ's placing his rejection of Plaintiff's credibility after his discussion of

23  Damania's post-hearing consultation suggests that he found  Plaintiff to lack credibility with

24  regard to her physical limitations.  Because the opinion is not clear, however, this Court must

25  consider whether the ALJ could appropriately have found Plaintiff's testimony regarding her

26  psychiatric limitations not credible.

27       An ALJ is not "required to believe every allegation of disabling pain" or other non-

28  exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*,

885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's testimony after a

medical impairment has been established, the ALJ must make specific findings assessing the

credibility of the claimant's subjective complaints.  *Ceguerra v. Secretary of Health and Human*

*Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not

credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834,

*quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He

or she must set forth specific reasons for rejecting the claim, explaining why the testimony is

unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466

F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the

court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v.*

*Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation

for truthfulness, inconsistencies in claimant's testimony or between his or her testimony and

conduct, claimant's daily activities, claimant's work record, and testimony from physicians and

third parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social*

*Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary

techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent

statements concerning the symptoms, and other testimony by the claimant that appears less than

candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a

prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533

F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the

ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her

decision.  *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

[T]o discredit a claimant's testimony when a medical impairment has been
established, the ALJ must provide "'specific cogent reasons for the disbelief.'"
*Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The
ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.*
Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a
malingerer, those "reasons for rejecting the claimant's testimony must be clear and
convincing." *Id.*  Social Security Administration rulings specify the proper bases

for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

An ALJ may not disregard a claimant's testimony solely because objective medical evidence does not fully substantiate it. *Robbins*, 466 F.3d at 883.  Unless the ALJ finds that affirmative evidence demonstrates that the claimant is a malingerer, he or she can only find the claimant's testimony not credible by making specific findings of credibility and supporting each such finding with clear and convincing evidence. *Id.*  The ALJ did not do so in this case.

The regulations acknowledge that a claimant may be unable or unwilling to describe their limitations fully and accurately.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 D.1.b.  Nonetheless, many claimants with mental impairments are willing and able to describe their limitations. *Id.* Accordingly, the agency's fact finders are charged with carefully examining the claimant's statements to determine whether his or her statements are consistent with other information in the record as well as the general pattern of impairment described by the medical and other evidence. *Id.*  The ALJ focused primarily on Plaintiff's physical abilities, securing Damania's consultation following the hearing.  He determined that Plaintiff was exaggerating her psychiatric symptoms solely because of his misinterpretation of Harbison's comments on Plaintiff's MMPI II results:

In November 2004, Agreed Medical Examiner Dr. Harbison examined the claimant in connection with the work-related assault.  He diagnosed post-traumatic stress disorder, major depressive disorder and probable schizoid and avoidant traits and concluded that the claimant was not permanent and stationary from a psychiatric standpoint.  Dr. Harbison was also unable to estimate any permanent psychiatric disability or work function impairment.  He did, however, state that it was "unlikely" that the claimant would "be able to return to her usual and customary employment working in a group home environment, which I agree is consistent with the evidence and accept as a valid conclusion.

///

19

1  Dr. Harbison also noted that, after extensive mental testing, the claimant had an
2  "extremely elevated F score, "suggesting that she may be exaggerating to get
   attention or services.["] This indicates that Plaintiff's subjective statements may be
3  out of proportion to her actual limitations, although Plaintiff was hospitalized for 2
   days in June 2005 for an attempted suicide threat because she was facing financial
   difficulty, and for 2 days in March for an altered mental status caused by an
4  overdose of Ambien.

5  AR 15-16 (*internal references to exhibits omitted*).

6  The ALJ's findings include two clear errors.  First, although Harbison indicate that the

7  elevated F score could indicate that Plaintiff was exaggerating to get attention or services,

8  Harbison also indicated that the elevated score could indicate that Plaintiff was extremely

9  disturbed.  He recommended additional investigation as necessary to resolve the question.  The

10 ALJ simply ignored the alternative that Plaintiff was both truthful and deeply disturbed, as well as

11 subsequent evidence that supported a conclusion that Plaintiff indeed suffered from serious

12 mental problems.

13 Second, the ALJ's findings include an example of his baffling reluctance to acknowledge

14 Plaintiff's multiple suicide attempts as suicide attempts.  The records from Kaweah Delta Medical

15 Center unequivocally identify Plaintiff's March 2008 hospitalization as a suicide attempt, not

16 "altered mental status."

17 A review of the record as a whole suggests that Plaintiff demonstrated serious problems of

18 affect, anxiety, and personality, including multiple well-documented suicide attempts.  To the

19 extent that the ALJ intended to find Plaintiff's testimony regarding her psychiatric condition

20 lacked credibility, he erred.

21 **E.    Analysis of Medical Evidence**

22 Plaintiff also contends that the ALJ failed to give proper consideration to Dr. Land's

23 opinions and to re-cast the disability scales used for workers' compensation purposes to those

24 applicable in Social Security disability cases.  Ignoring Land's Work Impairment Form (AR 256),

25 which was supplementary to his final workers' compensation report, the Commissioner responds

26 that since Land's diagnosis was consistent with the ALJ's findings, the ALJ did not err.

27 Categories of work under the Social Security scheme are measured differently from

28 categories of work in the California workers' compensation scheme.  *Desrosiers v. Secretary of*

20

1   *Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988).   Under the workers' compensation

2   scheme, categories of work are not based on strength, but on "minimum demands for physical

3   effort," determined by whether the worker sits, stands or walks for most of the work day.   *Id.,*

4   *quoting* Schedule for Rating Permanent Disabilities, Guidelines for Work Capacity, 1-A

5   (California State Labor Code).   In contrast, categories of work under the Social Security scheme

6   are differentiated by step increases in lifting capabilities.   *Id.*   Guidelines for Work Capacity are

7   not conclusive in social security cases.   *Macri v. Chater*, 93 F.3d 540, 543-44 (9th Cir. 1996).   An

8   ALJ may draw logical inferences flowing from evidence of workers' compensation disability

9   determinations.   *Id.* at 544.

10         *Desrosiers* does not require an ALJ to convert workers' compensation terminology to its

11   Social Security equivalent.   In *Desrosiers*, the ALJ erred by failing to recognize the differences

12   between the two rating systems.   846 F.2d at 576. *See also Mejia-Raigoza v. Astrue*, 2010 WL

13   1797245 at *8 (E.D.Cal. May 3, 2010) (No. 1:09-cv-00441-DLB); *Cruz v. Astrue*, 2010 WL

14   582109 at * 7 (E.D. Cal. February 12, 2010) (No. 1:08-cv-01737-DLB).   No such error occurred

15   here.

16         Nonetheless, an ALJ may not simply disregard a medical opinion because it was initially

17   prepared for a state workers' compensation proceeding or is expressed in workers' compensation

18   terminology.   *Booth v. Barnhart*, 181 F.Supp.2d 1099, 1105 (C.D. Cal. 2002).   Here, however, the

19   ALJ appears completely to have missed the Work Impairment Form, claiming (at AR 14) that

20   Land "did not assess claimant's ability to work."   This was clear error.

21         Such carelessness and inattention to detail is the hallmark of the ALJ's handling of

22   Plaintiff's claims of psychiatric disability.   Indeed, the ALJ appears not to have performed any

23   reasoned evaluation of Plaintiff's mental impairments beyond his perfunctory dismissal of

24   whether Plaintiff's mental impairments met or medically equaled the listing criteria at Step 3 of

25   the disability analysis.

26       **C.**      **Inadequacy of Listing Criteria Analysis**

27         Having concluded that the ALJ twice erred in his analysis of Plaintiff's mental

28   impairments and generally addressed  Plaintiff's psychiatric limitations with little thoughtfulness

and attention to detail, the Court must determine whether to remand for further proceedings or to remand for payment of benefits. "The court shall have the power to enter, upon pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In social security cases, the decision to remand to the Commissioner to award benefits is within the court's discretion. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate." *Id.* (citation omitted). If the record is fully developed and further administrative proceedings will serve no useful purpose, a reviewing court should simply reverse and award benefits. *Varney*, 859 F.2d at 1399. Since the record is fully developed and Plaintiff's application can be expediently resolved by evaluating Plaintiff's claims in light of applicable law and the record as a whole, this Court will reverse and remand for payment of benefits. The Court finds that if a complete Step 3 analysis is performed, in accordance with applicable law, Plaintiff's mental impairments compel a finding that she is disabled.

Among Plaintiff's impairments, the ALJ included anxiety and personality disorder. At Step Three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, specifically listing 12.04 (affective disorders), listing 12.06 (anxiety related disorders), or listing 12.08 (personality disorders). The ALJ reviewed all three categories in a single analysis. For the most part, his decision set forth his bare legal conclusions without any explanation of how he reached those conclusions.

To evaluate disabilities based on mental illness, the agency considers documentation of medically determined impairments, the degree of limitations such impairments cause in the applicant's ability to work, and whether the limitations have lasted or can be expected to last for at least twelve months. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 A. Mental impairments may be evaluated under any one of nine separate categories: organic mental disorders; schizophrenic, paranoid and other psychotic disorders; affective disorders; mental retardation; anxiety-related

disorders; somatoform disorders; personality disorders; substance addiction disorders; or autistic

disorders.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.01.  As is apparent from the factual

background statement, Plaintiff has had a variety of diagnoses and of combinations of diagnoses,

including major depressive disorder; major depressive disorder superimposed on dysthymia;

major depression recurrent severe without psychotic features; history of dysthymic disorder;

generalized anxiety disorder; personality disorder: paranoid; posttraumatic stress syndrome,

chronic recurrent; adjustment disorder with anxiety; depressive personality disorder and self-

defeating personality disorder with schizoid and avoidant personality traits; probable schizoid and

avoidant traits.  Her medical records document numerous serious symptoms, including insomnia,

flashbacks, nightmares, panic attacks, and multiple suicide attempts.  The record also clearly and

consistently indicates that, while the 2003 workplace assault served as a trigger for Plaintiff's

serious psychiatric impairments, the subsequent recurrence of metastasized breast cancer

approximately a year after the assault and less than a year after she finally began to receive

psychiatric care, greatly magnified her mental impairments by expanding her nightmares and

flashbacks to include the physical, psychological, and sexual abuse she had experienced as a child.

As noted above, the ALJ purported to evaluate Plaintiff using 20 C.F.R., Pt. 404, Subpt. P,

App. 1, §§ 12.04, 12.06, and 12.08 which considered affective disorders, anxiety related disorders,

and personality disorders.  All three listings are similarly structured, first providing an

introductory statement characterizing the nature of the impairment.  Subpart A of each of listings

is tailored to set forth the criteria supporting the specific medical diagnosis.  20 C.F.R., Pt. 404,

Subpt. P, App. 1, §12.00A.  With regard to affective disorders, such as depression or bipolar

disorder, Section 12.04 provides:

> 12.04 *Affective Disorders:*  Characterized by a disturbance of mood,
> accompanied by full or partial manic or depressive syndrome.  Mood refers to
> prolonged emotion that colors the whole psychic life; it generally involves either
> elation or depression.
> The required level of severity for these disorders in met when the
> requirements in both A and B are satisfied, or when the requirements in C are
> satisfied.

///

///

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

1.  Depressive syndrome characterized by at least four of the following:

a.  Anhedonia or pervasive loss of interest in almost all activities;
b.  Appetite disturbance with change in weight; or
c.  Sleep disturbance; or
d.  Psychomotor agitation or retardation; or
e.  Decreased energy; or
f.  Feelings of guilt or worthlessness; or
g.  Difficulty concentrating or thinking; or
h.  Thoughts of suicide; or
I.  Hallucinations, delusions, or paranoid thinking . . . . .

With regard to anxiety-related disorders, Section 12.06 provides:

12.06.  *Anxiety Related Disorders:* In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.
     The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A.  Medically documented findings of at least one of the following:

1.  Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
a.  Motor tension; or
b.  Autonomic hyperactivity; or
c.  Apprehensive expectation; or
d.  Vigilance and scanning;

or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3.  Recurrent severe panic attacks manifested by a sudden unpredictable onset of instant apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4.  Recurrent obsessions or compulsions which are a source of marked distress; or

5.  Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

///

///

Finally, with regard to personality disorders, Section 12.08 provides:

12.08 *Personality Disorders.*  A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress.  Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.
　　　　The required level of severity for these disorders are met when the requirements in both A and B are satisfied.

　　　　A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

　　　　　　1.  Seclusiveness or autistic thinking; or
　　　　　　2.  Pathologically inappropriate suspiciousness or hostility; or
　　　　　　3.  Oddities of thought, perception, speech, and behavior; or
　　　　　　4.  Persistent disturbances of mood or affect; or
　　　　　　5.  Pathological dependence, passivity, or aggressivity; or
　　　　　　6.  Intense and unstable interpersonal relationships and impulsive and damaging behavior.

Despite having included only anxiety and personality disorder among Plaintiff's serious impairments, the ALJ appears to have accepted, without discussion, that Plaintiff satisfied the requirements of Sections 12.04A, 12.06A, and 12.08A.  This Court agrees.  With regard to affective symptoms and signs of affective disorders (§ 12.04A), the agency record amply documents Plaintiff's loss of interest in nearly all activities, appetite disturbances, marked sleep disturbance, nearly inert lifestyle, psychomotor disturbances that prevented sleep and concentration, decreased energy, impairments of thinking and concentration, suicidal thoughts, and actual suicide attempts.  Plaintiff's panic attacks and post-traumatic stress syndrome evidenced by flashbacks and nightmares similarly satisfy the requirements for anxiety related disorders (§ 12.06A).  Finally, Plaintiff's signs and symptoms included substantial evidence of seclusiveness, inappropriate suspicious behavior (paranoia), and persistent mood disturbance, satisfying the requirements for personality disorders (§ 12.08A).

Thus, the remaining criteria of §§12.04 B, 12.06 B, and 12.08 B constitute the relevant analysis.  Subsection B is the same for all three listings:

　　　　B.  Resulting in at least two of the following:

　　　　　　1.  Marked restriction of activities of daily living; or
　　　　　　2.  Marked difficulties in maintaining social functioning; or
　　　　　　3.  Marked difficulties in maintaining concentration, persistence, or pace; or
　　　　　　4.  Repeated episodes of decompensation, each of extended duration.

**Daily Living.**  Without great detail, the ALJ concluded that Plaintiff had a mild restriction of the activities of daily living, since she read, cared for her plants, prepared light meals, shopped, and used public transportation.  The regulation provides:

> *Activities of daily living* include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.  In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.  We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

> We do not define "marked" by a specific number of activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.1.

"The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits."  *Fair*, 885 F.2d at 603.  In addition, as specified in the regulation's last paragraph, a claimant's daily functioning must be evaluated in the context of his or her situation.  For example, the Ninth Circuit rejected a District Court's conclusion that a claimant's ability to shop, prepare food, and drive proved that he could function outside the supportive residence in which he lived.  *Esselstrom v. Chater*, 67 F.3d 869, 873 (9th Cir. 1995).  Citing psychiatric opinions that the claimant needed to remain in a supportive living situation, the Circuit Court noted that the claimant could function in these aspects of his life precisely because he lived within a support group.  *Id.  Compare Esselstrom* to Plaintiff's release from Kaweah Medical Center only on the condition that her daughter, with whom she lived, would limit Plaintiff's access to her medications.

In Plaintiff's situation, she performed various activities of daily living despite psychological factors that shaped and interrupted her performance of those activities.  Plaintiff could shop, but experienced panic attacks and fled the store when confronted with large groups of people.  Plaintiff could clean and cook for herself in the solitude of her apartment because she felt safe in her apartment, but her physical capacity to do a job in private does not imply that she is

capable of doing the same job in the presence of other people.  Plaintiff's mental illness, not her physical capabilities, gives rise to her disability.

**Social Functioning.**  The ALJ concluded that, although Plaintiff was capable of getting along with others, she had moderate limitations in the area of social functioning since she tended to isolate herself.  The regulatory definition states:

> *Social functioning* refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  You may have demonstrated impaired social functioning by, for example, a history of altercations, evictions, firings, ***fear of strangers, avoidance of interpersonal relationships, or social isolation***.  You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities.  We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity.  Social functioning in work situations may involve interaction with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.
>
> We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local shopkeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.2 (*emphasis added*).

Where a claimant was significantly socially isolated except for her AA meetings, the claimant met the criteria for impaired social functioning.  *Holohan v. Massanari*, 246 F.3d 1195, 1204 (9th Cir. 2001).  The Ninth Circuit noted that social isolation except for AA meetings exceeded moderate isolation and qualified as marked isolation.  *Id., n.* 3.  Substantial evidence indicates that Plaintiff's social functioning, which was almost nonexistent, was worse than that of Holohan.

Except for a few individuals (daughter, sister-in-law, and treating professionals), Plaintiff was totally isolated.  She could not tolerate extended family gatherings because family members argued with each other.  When her son turned her away from a planned family visit, Plaintiff responded by overdosing on sleeping pills and Lamictal, resulting in two-days hospitalization.

///

Plaintiff lived in fear of people, sometimes drawing her blinds and hiding in her apartment. Although she ventured out shopping about once a week, she avoided any situation with large numbers of people. If a store was crowded, she had a panic attack and fled. She waited for another bus if the first one was too crowded for comfort. Such need for accommodation indicates a marked limitation in social functioning. *See Larson v. Astrue*, 615 F.3d 744, 748-49 (7th Cir. 2010) (concluding that Larson had marked limitations in social functioning where she avoided crowds, hid in the bathroom from her employers' customers, and did her grocery shopping only at night when the store was not crowded). Such behavior is tolerable in personal life but problematic in the workplace.

**Concentration, Persistence, and Pace.** The ALJ concluded that Plaintiff had mild-to-moderate difficulties with concentration, persistence, or pace, citing solely confusion that was a side effect of her medications. The corresponding regulatory provision provides:

*Concentration, persistence, or pace* refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence or pace are best observed in work settings, but also may be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits.

In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks (e.g., filing index cards, locating phone numbers, or disassembling and reassembling objects). Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective.

We must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on your ability to complete tasks in other settings that are less demanding, highly structured, or more supportive. We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.

1
2
3
4
5
6

We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function.  You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks.  Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion.  However, if you can complete many simple tasks, we may nevertheless find that you have marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

7      Holohan met the criteria for impaired concentration, persistence, and pace because her

8  doctor stated that her anxiety and general poor concentration impaired her ability to concentrate

9  on work-related tasks.  *Holohan*, 246 F.3d at 1204.  The doctor explained that Holohan's anxiety

10  and panic attacks led to repeated cognitive break-up throughout the day that prevented her from

11  focusing on her work.  *Id.*  Symptoms of depression, including lack of interest in things,

12  hopelessness, and impaired decision-making interacted with Holohan's anxiety, markedly

13  impairing her ability to function in a workplace.  *Id.*  Although Plaintiff's depression and anxiety

14  likely impair her concentration, persistence, and pace in a similar fashion, her physicians and

15  therapists did not provide explicit opinions articulating Plaintiff's impairments of concentration,

16  persistence, and pace, as Holohan's doctor did.  Nonetheless, the agency record amply depression,

17  anxiety, and personality disturbances, including paranoia, that similarly would have impaired

18  Plaintiff's concentration, persistence, and pace.

19      Plaintiff was an intelligent and capable person.  Following her divorce, as a single mother

20  in a tumultuous extended family, she nonetheless enrolled in college and completed a bachelor's

21  degree, and all the course work for a master's degree, in social work.  Even after her first bout of

22  breast cancer, she continued to progress in her field, working as a counselor and group home

23  supervisor until she was attacked and stabbed in the leg in 2003.  Within a few days of the attack,

24  Plaintiff began to experience overwhelming flashbacks, nightmares, and intrusive thoughts that

25  reduced her to tears.  Panic attacks were accompanied by chest pain, shortness of breath,

26  trembling, and dissociation.  With time, the scar that remained on Plaintiff's knee became a

27  trigger for the flashbacks, intrusive thoughts, and panic attacks.

28  ///

1    Although first explained as reorganization, then as a means of reducing stress, Plaintiff's

2  job responsibilities changed twice in the month after the attack.  Whatever the intent of

3  management, Plaintiff interpreted the job re-classifications as demotion and retaliation for having

4  been attacked.  Plaintiff also told Land that the people around her talked about her and laughed at

5  her.

6    Because Plaintiff was continually frightened that someone was after her, she hid in her

7  apartment with the blinds closed.  According to several treating professionals, she was

8  hypervigilant and easily startled.  She avoided situations she found threatening, avoiding the

9  neighborhood in which the group home was located.

10    The record documents depression, including unprovoked crying, decreased energy and

11  motivation, impaired concentration, irritability, feelings of hopelessness and helplessness, and loss

12  of interest in activities she previously enjoyed.  She experienced insomnia, decreased libido, and

13  loss of appetite, at one point losing 38 pounds.  Plaintiff had persistent suicidal thoughts (suicidal

14  ideation), contacted the suicide crisis center on multiple occasions, and attempted suicide on

15  multiple occasions.

16    In December 2006, the agency interviewer noted that Plaintiff had difficulty remembering

17  basic information and concentrating during the telephone interview to obtain the information

18  needed for her disability application (*see* AR 151).  In August 2007, Plaintiff's therapist noted that

19  Plaintiff was displaying memory problems during the therapy session.

20    In December 2007 and January 2008, psychiatrist Bogost noted increased depression and

21  weeping, increased complaints of anxiety and irritability, anhedonia, apathy, and impaired

22  memory.  Plaintiff forgot to pick up her medications.  Her intelligence appeared below normal

23  ("retarded"); her thoughts were disorganized; and she was slow to respond to questions.

24    **Decompensation episodes.**  The ALJ concluded without explanation that the evidence

25  failed to establish that Plaintiff experienced episodes of decompensation.  AR 10.  A review of the

26  regulatory definition of episodes of decompensation suggests that the ALJ erred.  The regulation

27  provides:

28  *///*

*Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by loss of adaptive functioning, as manifested by difficulties in performing activities in daily living, maintaining social relationships, or maintaining concentration, persistence or pace.  Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directed household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within one year, or an average of once every 4 months, each lasting for at least 2 weeks.  ***If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.***

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.4 (*emphasis added*).

Subsection B. 4. first requires the claimant to establish repeated episodes of decompensation, each of extended duration, as one of four possible results of the claimant's subsection A. symptoms.  The ALJ relied on that portion of the regulation to find that Plaintiff demonstrated no signs of decompensation.  The regulation also provides, however, that ALJ's must exercise judgment in determining whether a claimant whose episodes of decompensation are more frequent than required, but of shorter duration, have also met the standard.  *See Larson*, 615 F.3d at 750.  The ALJ did not consider whether Plaintiff's panic attacks, suicide attempts, suicidal ideation, and paranoid behavior constituted a degree of decompensation within the regulatory objective.  Yet viewed as a whole, Plaintiff's signs and symptoms support the conclusion that Plaintiff experiences a continuing series of short, repeated episodes of decompensation.

"'[E]pisodes of decompensation' is not a self-defining phrase." *Id.* at 750.  It has been defined as the "appearance or exacerbation of a mental disorder due to failure of defense mechanisms" *(Id.*, quoting *Stedman's Medical Dictionary* at 497 (28th ed. 2006)), and as "a temporary increase in symptoms.' *Zabala v. Astrue*, 595 F.3d 402, 405 (2d Cir. 2010); *Kohler v. Astrue*, 546 F.3d 260, 266 n. 5 (2d Cir. 2008).  Evidence of episodes of decompensation include the need for a more structured psychological support system, as by hospitalization and placement in a halfway house; significant changes in medication; symptoms that cause the claimant to miss

work; changes in medication and fluctuating mood; and side effects of medication that affect the claimant's functioning; symptoms that require increased treatment or a less stressful situation. *Larson*, 615 F.3d at 750, *citing Rabbers v. Commissioner, Social Security Administration*, 582 F.3d 647, 660 (6th Cir. 2009); *Lankford v. Sullivan*, 942 F.2d 301, 307-08 (6th Cir. 1991); *Natale v. Commissioner of Social Security*, 651 F.Supp.2d 434, 451-53 (W.D, Pa. 2009).

Episodes of decompensation also include panic attacks, since these meet the requirement of a symptom or sign requiring retreat to a less stressful situation.  For example, Holohan experienced panic attacks during quiet times, including during classes and study periods. *Holohan*, 246 F.3d at 1204, n. 4.  She testified that when she had a panic attack while reading, she came to associate the book in question with anxiety and panicked each time she had to go back to read or study that book.  *Id.*  The Ninth Circuit characterized Holohan's panic attacks as "decompensation," in that they exacerbated her symptoms and caused her to withdraw from the stressor.  *Id.*  In Plaintiff's case, stressors included the presence of too many people, the sight of her scarred knee, and memories of childhood abuse that caused her to experience physical symptoms and to immediately withdraw from the stressful situation.  Despite her highly constrained lifestyle at the time of the hearing, Plaintiff testified to experiencing panic attacks about three times weekly.

Chronic mental illnesses may include periods between bouts of acute symptoms in which the claimant's symptoms, while sufficiently controlled to permit the claimant to live independently, still prevent the claimant from pursuing normal employment.  *See, e.g., Esselstrom*, 67 F.3d at 872-73 (addressing claim under 20 C.F.R. 12.03 (schizophrenia)). Esselstrom's demonstrated episodes of decompensation included his fantasizing about killing former high school teachers he met on the street and his inability to dine in restaurants because of his inability to deal with the presence of other people there.  *Id.*  Plaintiff's decompensation manifested itself in paranoid behavior, panic attacks, suicidal ideation, and suicide attempts.

As a whole, the evidence indicated Plaintiff's need for a highly structured lifestyle in which she isolated himself in her apartment to avoid the debilitating stress of dealing with others. ///

She relied on a system of psychological support that included medication, group and individual therapy, and brief hospitalizations following multiple suicide attempts.

The ALJ erred in concluding that Plaintiff demonstrated no signs of decompensation.

**Subsections B satisfied.** When considered as a whole, evidence within the record supported a finding of the existence of all four of the resulting impairments listed in subsection B. Since only two are needed, the Court concludes that Plaintiff's mental impairments met or equaled the impairments listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06, and 12.08.

**III.** **Conclusion**

Accordingly, this Court orders that the administrative determination be REVERSED and the case REMANDED for payment of benefits.  The Clerk of Court is hereby directed to ENTER JUDGMENT in favor of Plaintiff Adela M. Rodriguez and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:    April 7, 2011**                      **/s/ Sandra M. Snyder**
                                             UNITED STATES MAGISTRATE JUDGE